**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 06-20734-CIV-SEITZ/MCALILEY

CARLOS PEREZ, ERIC ZIMELMAN,
ANGELA D. RIEKE and DOROTHY
HAYS, individually and on behalf of
all others similarly situated,

Plaintiffs,
vs.

ASURION CORPORATION; ASURION
INSURANCE SERVICES, INC.; ASURION
FLORIDA WARRANTY SERVICES, INC.;
LOCK/LINE, LLC; and LOCK/LINE
WARRANTY SERVICES OF FLORIDA, LLC,

Defendants.
_____/

**ORDER GRANTING CLASS COUNSEL'S MOTION IN SUPPORT**
**OF REQUEST FOR FINAL APPROVAL OF SETTLEMENT AND CLOSING CASE**

THIS MATTER is before the Court on Class Counsel's Motion in Support of Request for Final

Approval of the Settlement [DE-132].  The matter came before the Court on June 22, 2007 for an

evidentiary hearing pursuant to Federal Rule of Civil Procedure 23(e)(1)(A) (the "Final Fairness

Hearing"), as to the fairness, reasonableness and adequacy of the parties' proposed settlement of this

class action lawsuit (the "Settlement").  The Court has carefully reviewed the parties' and objectors'

papers, the evidence submitted, the statements of all counsel at the Final Fairness Hearing, the applicable

law, and the other relevant portions of the record.  Upon due consideration, the Court grants Class

Counsel's motion and approves this Settlement.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

1.      There are over 234 million cell phone accounts in the United States, and over 70

million cell phones are lost and/or damaged each year.  As a result, Defendants have approximately 40

million customers, and almost one quarter of their customers make claims under their "wireless phone

1

protection plans" each year.

2.      This litigation arises out of Plaintiffs' dissatisfaction with the wireless phone protection plans in which they enrolled to insure their cellular phones.  Plaintiffs argue, among other things, that these protection plans are not really insurance:  the required monthly premium "do[es] nothing more than create a right … to have the opportunity to pay additional monies in the form of the so-called 'deductible' in order to receive a refurbished phone worth less than the deductible alone."  (Original Compl. ¶ 28, filed in Prohias v. Asurion Corp., Case No. 05-22259-CIV-SEITZ/MCALILEY [the "Original Complaint"].)  The Original Complaint (further defined in paragraph 6, below) was filed on August 15, 2005, and included allegations that Defendants fail to adequately inform consumers they may receive a refurbished phone; "demand unreasonable and large deductibles" that "range from $35 to $100 for each replacement phone;" and send out replacement phones which cost much "less than even the deductibles that the customers are required to pay."  (Id. ¶¶ 1, 9.)  However, this last allegation has proven unsupportable.  Discovery has established that the vast majority of replacement phones Defendants furnished to subscribers in fulfillment of claims – including refurbished phones – cost more than the deductibles charged.

3.      This Settlement will provide relief for approximately 10.3 million Class members (the "Class" or the "National Class").  It is the result of combining into a single action before this Court three separate class actions – two that have been litigated before this Court for approximately two years and one that has been litigated in the United States District Court for the Southern District of California for a slightly longer period.

4.      The California Litigation.  On July 5, 2005, Plaintiff Angela Rieke filed a proposed class action in the United States District Court for the Southern District of California against Asurion Corporation ("Asurion Corp."), Asurion Insurance Services, Inc. ("AIS"), and Hartford Fire Insurance Company ("Hartford"), for which AIS serves as an agent.  That case is styled *Rieke v. Asurion Corp.*,

2

Case No. 05-CV-1357-IEG (JFS) (the "California Litigation").  Plaintiff Rieke alleged nine causes of action including, among other things, that she and other similarly situated subscribers received replacement phones from AIS worth less than the deductibles charged in the insurance program to which she subscribed.  AIS, Asurion Corp., and Hartford filed motions to dismiss in the case, and the district court granted the motion as to certain of the claims, but allowed several other claims to proceed.

5.      The parties in the California Litigation conducted written discovery and took various depositions, including the deposition of Plaintiff Rieke and AIS's corporate representative.  Asurion Corp., AIS, and Hartford answered the Second Amended Complaint, and class certification and merits discovery commenced.

6.      The Florida Litigation.  On August 16, 2005, Plaintiff Maria Prohias[1] filed a proposed class action in this Court against three different groups of Defendants:  (1) Asurion Corp., AIS, and Asurion Florida Warranty Services, Inc. ("AFWS") (collectively "Asurion"); (2) lock\line LLC and lock\line Warranty Services of Florida (collectively "lock\line"); and (3) The Signal and Signal Holdings, (collectively "The Signal").  Thereafter, the Defendants filed extensive motions to dismiss, based in part on a prior settlement involving the Defendants (the "*Greiff* Settlement") and the alleged legal inadequacy of each of the pled claims.  Plaintiffs filed oppositions to these motions.

7.      All counsel met and conducted an initial conference to prepare a Joint Scheduling Report.  In the Joint Scheduling Report, Plaintiff described the Defendants' practices as unfair, claiming they required "deductibles which exceed the value of the replacement used or refurbished phones."  Plaintiff served discovery upon each Defendant, including requests for production, interrogatories and notices for corporate representative depositions.  The parties negotiated and litigated the scope of discovery.  All parties served their required Initial Disclosures.

---

[1]      This is the "Original Complaint" referenced in paragraph 2 of this Order.  Ultimately, Plaintiff Jose Sanchez replaced Plaintiff Prohias as the named class representative in the case.

8.      On March 3, 2006, the Court conducted an initial status conference to discuss the motions to dismiss, among other things.  At the hearing, the Court granted in part lock\line's motion to dismiss without prejudice, specifically holding that Plaintiff Prohias did not have standing to bring any claims against lock\line.  The Court held that

> even though Plaintiff Prohias purportedly has paid premium charges to the lock/line Defendants . . . , she can only speculate that lock/line would have sent her a lower-value and/or defective replacement phone, had she needed one.  Such speculation that she would not have received the benefit of her bargain does not constitute an injury-in-fact.

(Mar. 6, 2006 Order [DE-87].)  Accordingly, the Court required Plaintiffs to demonstrate in the amended pleadings that each proposed class representative had standing with respect to each Defendant – by showing that they not only paid premiums, but also that they received a replacement phone that was either defective or of a lower value than their deductible.  The Court lifted the stay on class certification and merits discovery as to the remaining claims.

9.      The Separation of the Cases.  Pursuant to the Court's Order, three individual putative class action complaints were filed in March 2006 against Asurion, lock\line and The Signal, respectively. Carlos Perez filed a complaint against Asurion (*Perez v. Asurion Corp.*, Case No. 06-20734-CIV-SEITZ/ MCALILEY); Maria Prohias filed a complaint against The Signal (this case retained the original case number, 05-22259); and Milva Lissabet, Eduardo Perez, Eric Zimelman, Dorothy Hays, and Lisha Gomez filed a complaint against lock\line[2] *(Lissabet v. lock\line*, Case No. 06-20733-CIV-SEITZ/ MCALILEY).  This Settlement involves only the *Perez* and *Lissabet* actions.[3]

10.     Discovery Conducted in the California and Florida Litigations.  For approximately

---

[2]      Asurion Corp. merged with DTS lock/line Inc. on January 1, 2006.

[3]      By Order dated April 3, 2007 [DE-154], the Court denied Plaintiffs' Motion for Class Certification in Case No. 05-22259-CIV (against The Signal defendants).  Plaintiffs filed a motion for reconsideration [DE-156], which this Court denied on May 16, 2007 [DE-163].  On June 4, 2007, the Court issued a Final Order Dismissing Case With Prejudice [DE-166], based on the parties' Joint Stipulation of Dismissal With Prejudice [DE-164].

eighteen months, the parties in all three lawsuits conducted discovery on the relevant issues.  Among

other things, Defendants served document requests on all Plaintiffs and took the depositions of the

individual class representatives, Angela Rieke, Carlos Perez, Eric Zimelman, Dorothy Hays, Lisha

Gomez, and Eduardo Perez.  Plaintiffs' discovery focused on both the merits of their claims and the

viability of a certifiable class.  Plaintiffs propounded document requests and interrogatories to

Defendants and took the depositions of several of Asurion's and lock/line's corporate representatives,

eliciting testimony on numerous topics, including:

> \*      The cost of the replacement equipment furnished to subscribers, including the named
Plaintiffs, in fulfillment of subscribers' claims;

> \*      The cost of fulfilling subscribers' claims;

> \*      The value of the replacement equipment furnished to subscribers, including the named
Plaintiffs, in fulfillment of subscribers' claims;

> \*      The process by which Defendants procure equipment;

> \*      The procedure for administering subscribers' claims, including the "script" used by
customer service representatives and claims adjusters when processing subscribers' claims;

> \*      The policies, guidelines, practices, procedures and/or criteria for determining and setting
deductibles for filing claims for lost, damaged and/or stolen wireless equipment;

> \*      The policies, guidelines, practices, procedures and/or criteria for evaluating and either
denying and/or approving submitted claims regarding wireless equipment;

> \*      The policies, guidelines, practices, procedures and/or criteria for providing replacement
equipment and determining whether wireless equipment is "of like kind and quality;"

> \*      Any and all goods and/or services that were provided by Asurion and lock\line and/or an
affiliated entity to Plaintiffs and any and all documents, materials and/or information that was provided
by Asurion and lock\line to them relating to issues in this litigation; and

\*      The drafting and interpretation of the underlying insurance policies.

11.      In response to Plaintiffs' document requests, the Defendants in *Rieke*, *Perez*, and *Lissabet* produced over 100,000 pages of documents, including data and charts that reflected AIS's actual and direct costs for procuring and shipping the replacement phones during the Class Period.  In the *Rieke* Action, Plaintiffs' discovery efforts also focused on the drafting, interpretation, and implementation of the applicable insurance policies, including the use of the term "deductible."

12.      On June 20, 2006, Asurion filed an extensive motion for summary judgment [DE-21], seeking to dismiss all claims alleged against it.  On June 23, 2006, lock\line filed its own motion for summary judgment as to all claims.  The primary basis of these motions was that the value of each of the replacement phones provided to the entire putative class always exceeded the paid deductibles, when all costs were included.  The motions also included a legal challenge to the viability of the Plaintiffs' unjust enrichment claims.  Plaintiffs filed equally extensive responses to the motions.  Given the pending settlement, the Court has denied these motions as moot.

13.      On June 26, 2006, Plaintiffs Perez and Lissabet filed comprehensive motions for class certification, seeking to certify a nationwide class of all subscribers.  (DE-26, in Case No. 06-20734 and DE-24, in Case No. 06-20733.)  The Plaintiffs alleged that both cases could be certified on a nationwide basis.  Defendants filed lengthy oppositions to each motion.  The certification motions were pending when this settlement was reached.

14.      <u>The Settlement Discussions.</u>[4]   The parties spent more than eight months discussing the terms of a possible settlement of both the California and Florida Litigations, after discovery revealed various pertinent facts (including the actual cost of the new and refurbished replacement phones) and after Plaintiffs were able to obtain evidence confirming Defendants' nationwide practices.

---

[4]      The Court's findings regarding the settlement discussions and mediation sessions are based on the parties' representations to the Court.

15.     <u>First Mediation Session.</u>  In early May 2006, the parties contacted Brian Spector, an experienced mediator, to serve as the mediator in these cases.  In early June 2006, Mr. Spector required the parties to submit briefs regarding the pending claims and allegations.  He asked for copies of all key pleadings, as well as a confidential mediation statement that summarized each party's factual and legal positions.  Finally, he requested a recitation of any prior settlement discussions and any pending settlement demands and offers.  On July, 12, 2006, the parties conducted the first mediation session.  Counsel for each party and Asurion's corporate representative attended the day-long session, which included opening statements and individual and group meetings to discuss the merits and weaknesses of the case.  At the conclusion of the session, the parties determined that settlement was impossible without further discovery regarding certain critical issues.  The parties were able to reach agreement on a settlement discovery plan, which the Court approved.

16.     <u>Settlement-Specific Discovery Plan.</u>  First, Defendants quickly produced documents and information regarding the total number of refurbished phones that were provided during the Class Period and the manner in which Defendants purchased those phones (if obtained from a third party source).  These documents included, *inter alia*, contracts with suppliers for the phones, alternative offers provided by competing suppliers, and analysis and reports regarding these offers.  The Defendants and insurance carriers also exchanged documents regarding the values of the replacement phones.

17.     Second, Defendants produced additional witnesses to testify regarding their procurement costs for replacement phones.  Lastly, Defendants assisted in producing for deposition a representative from one of the largest phone suppliers.  Plaintiffs agreed to research and provide to Defendants, within ten days after Defendants' discovery obligations were complete, alternative sources for refurbished phones and the relevant costs based upon such sources.

18.     In late October 2006, the parties advised the Court and the mediator that they had completed all of the settlement discovery, and they were ready to conduct a second mediation session.

The parties conducted several telephonic conferences to advance the settlement process and prepare for the second mediation session.

19.     The *Greiff* Settlement.   In negotiating the terms of the settlement, Plaintiffs considered the objections made to the previously mentioned *Greiff* Settlement.   The *Greiff* case was a class action law suit in Pennsylvania state court filed in 2001 (*In re Wireless Equip. Ins. Litig.*, Case No. GD-01-14629), involving the at-issue wireless phone protection plans.[5]   The *Greiff* Settlement consisted solely of a distribution of phone cards to class members; there were no vouchers for replacement phones or other injunctive relief.   In structuring the terms of the instant Settlement, Class Counsel particularly analyzed those objections that dealt with the specific relief to the *Greiff* class.

20.     Second Mediation Session.   On November 13, 2006, the parties conducted another day-long mediation session, during which they discussed the provisions of the proposed Settlement.   The parties discussed every provision of the proposed Settlement, including the specific details of the proposed vouchers and phone cards and the prospective injunctive relief.

21.     The first issue that the parties negotiated and resolved was the injunctive relief for the entire class.   With over 70 million phones lost and/or damaged each year, Class Counsel wanted to ensure that no customer would ever again receive a replacement phone worth less than the deductible Defendants charged.   Accordingly, Defendants agreed that:  (1) each and every placard and brochure distributed after the Settlement date would inform customers that they might receive a refurbished phone and that they would be paying a non-refundable fee and/or deductible; and (2) no customer would ever receive a replacement phone valued at less than the paid deductible, unless that customer was specifically so informed and accepted such a phone.

22.     The parties also spent an entire day negotiating the details of the proposed phone cards

---

[5]     Defendants had originally raised the *Grieff* case early in the course of these proceedings, in an attempt to argue that the *Grieff* Settlement barred Plaintiffs' claims here.

and vouchers.  Initially, Defendants had only been willing to provide monetary relief to the approximately 15,000 customers who had received refurbished replacement phones with acquisition costs less than the applicable deductibles.  According to Defendants, the Court's ruling on standing made it clear that all other class members did not suffer any "injury in fact," and thus, would not be entitled to any monetary relief.  Ultimately, Defendants recognized that – to achieve a global settlement, and in light of the unknown result from a jury trial – they would have to provide some monetary relief for all customers who received a refurbished phone during the Class Period, whether or not such phone was, in fact, valued more than the applicable deductible and whether or not such Class member even knew he/she would be receiving a refurbished phone.  The parties then separated the discussions between relief for a proposed Subclass and a proposed National Class.

       23.    <u>Negotiations Regarding the Proposed Subclass.</u>  By the time of the Second Mediation, Defendants had already provided Class Counsel with extensive discovery showing that the average loss for each Subclass member (namely, the difference in value between the paid deductible and the value of the replacement phone) was between $3 and $8.  Based on this information, the parties agreed that these customers would be given vouchers entitling them to an <u>additional</u> replacement phone that had a value greater than any deductible already paid to the Defendants.  These customers would not be required to return the original replacement phone they had already received after paying the deductible.  (For example, if a customer paid a deductible of $50, he or she would be entitled to an additional phone with a value of at least $75.  If a customer paid a deductible of $100, he or she would be entitled to an additional phone with a value of at least $125.)  To increase the value of these vouchers, Class Counsel demanded that the vouchers be fully transferable and not expire for 90 days.  Moreover, to ensure maximum recovery, Class Counsel demanded that each voucher be mailed directly to the last known address for each Subclass member, without the need for a claims process.  Ultimately, Defendants agreed to these provisions.

24.     <u>Negotiations Regarding the Proposed National Class.</u>  Defendants initially took the

position that the injunctive relief discussed in paragraph 21 of this Order would be sufficient relief for

the National Class.  Class Counsel insisted that Defendants provide some form of monetary relief to each

National Class member.  In light of their view that they would likely ultimately prevail, Defendants

would not agree to any settlement that involved a cash payment to each National Class member.  Instead,

Defendants agreed to distribute phone cards to the National Class members who submitted a claim form.[6]

After much debate, the parties agreed upon a minimum distribution of phone cards in the amount of $1.5

million.  The parties also agreed that each card would have a face value of $5, providing a minimum of

50 minutes of calling time for each card at 10 cents per minute.  (Based upon the recently updated

information on the number of claims filed, each phone card will now have a value of between

approximately $10 to $12.)  The parties further agreed that the cards would be fully transferable and

valid for one year.  Finally, the parties agreed not to require that Class members sign a claim form "under

oath" or provide any additional records with the claim form.

25.     Thus, at the conclusion of the Second Mediation, the parties agreed on a Memorandum

of Understanding ("MOU"), which confirmed the terms of the proposed Settlement.  The terms outlined

in the MOU are the same terms that are outlined in the parties' Stipulation of Settlement and Release

("Settlement Agreement" [Ex. B contained in DE-50; as amended in DE-63; amended again in DE-83]).

The parties have advised the Court that they did not discuss the issue of attorneys' fees until after they

had agreed on the substantive terms of the Settlement.

26.     <u>The Fourth Amended Complaint.</u>  On January 8, 2007, the parties filed a "Joint Motion

---

[6]     Similarly, in *Greiff*, *supra*, the court approved a settlement in which the distribution of phone cards with a face value of $5 to class members was the sole monetary relief to the aggrieved class.

for Leave to File Fourth Amended Complaint[7] and for Preliminary Approval of the Settlement and Incorporated Memorandum of Law" (the "Joint Motion" [DE-50]).  On January 9, 2007, the Court held a hearing on the Joint Motion (the "First Hearing"), and instructed the parties to address certain specific aspects of the Joint Motion at another hearing set for January 23, 2007.  On January 18, 2007, the parties filed a "Corrected Joint Motion for Leave to File Fourth Amended Complaint and for Preliminary Approval of the Settlement and Incorporated Memorandum of Law" (the "Corrected Joint Motion" [DE-56]).

27.    On January 23, 2007, the Court conducted a second hearing (the "Second Hearing"), at which it granted preliminary approval of the Corrected Joint Motion.  The Court also directed the parties to do the following:  (1) provide supplemental information as to why they selected *USA Weekend* as the periodical in which to publish notice of the Settlement Agreement; (2) submit evidence of their efforts to provide additional notice regarding the *Perez* case to Class members in the form of general media and consumer reports and press releases; (3) publish a history of the course of this litigation on the Settlement Website; and (4) file a depiction of the Settlement Website prior to the Final Fairness Hearing.  The parties complied with these requirements.

28.    At the Second Hearing, the parties also advised the Court of a recently filed proposed class action in the United States District Court for the Central District of California, *Cole v. Asurion Corp.*, Case No. CV 06-6469 DDP (the "*Cole* case").  The *Cole* case raised allegations relating to claims made under Asurion's Program with T-Mobile, where the applicable deductible was either $40, $70, or $110.  Class counsel had discussions with plaintiff's counsel in *Cole* prior to the Second Hearing.  While the plaintiff in *Cole* had an applicable deductible of $110, the class sought in the *Cole* Amended

---

[7]    The Fourth Amended Class Action Complaint consolidated the *Perez*, *Lissabet*, and *Rieke* actions, and contained essentially the same factual and legal allegations found in the individual complaints for those cases. Further, the Fourth Amended Class Action Complaint redefined the putative class to encompass a nationwide class of consumers.

Complaint is not limited to only $110 deductible claims, but rather includes all individuals who purchased insurance from Asurion through T-Mobile who "were asked to pay or paid a deductible which exceeded the acquisition cost by Asurion of the replacement phone."  (DE-69, in Case No. 06-20734.)

29.     The First Amended Complaint in *Cole* adopts virtually verbatim the allegations from the California and Florida Litigations, which had been filed almost 15 months earlier.  As of the time of this Court's preliminary approval of this Settlement, discovery had not yet commenced in *Cole*, and Plaintiff Cole had not yet filed a motion for class certification.  The papers the parties submitted for preliminary approval of the instant Settlement, including the Motion for Leave to File the Fourth Amended Complaint, all identified *Cole* and informed the Court that the proposed Settlement would overlap with some of the claims raised in *Cole*.

30.     Although the plaintiff in the *Cole* case is not a member of this Class, in that she never received a refurbished phone (or any phone) from Defendants, the Court instructed the parties that it was important to investigate all of the issues raised in *Cole* as they might relate to the proposed Settlement.

31.     At the conclusion of the Second Hearing, the Court entered a verbal Order:  (1) granting preliminary approval of the parties' Settlement; (2) authorizing the sending of the proposed Notice to National Class and Subclass members as revised; (3) appointing Rust as the Claims Administrator; (4) appointing Class Counsel; and (5) setting a Final Fairness Hearing.  (DE-60, in Case No. 06-20734.) The Court instructed the parties to file a more detailed, written proposed Order that would memorialize the Court's verbal Order.  The Court also instructed the parties to provide any proposals to amend and enhance the approved Settlement in light of the allegations raised in *Cole* and/or any other litigation.

32.     On February 13, 2007, the parties filed the affidavit of Andrew Novak, which explained the reason for selecting the weekend edition of *USA Today* for publication of Class Notice.  (DE-67, in Case No. 06-20734.)  Based on this affidavit, the Court approved the weekend edition of *USA Today* for the publication of Class Notice.

33.     After the Second Hearing, Defendants determined that there was a very small group of National Class members who had deductibles other than $50 – namely $40, $85 and $110 – who made a claim, paid the premiums and the deductibles, and received refurbished phones whose equipment cost was less than the applicable deductibles.

34.     Plaintiffs asked Defendants immediately to provide confirming discovery under oath regarding this group of National Class members.  In response, Defendants provided Plaintiffs with detailed charts and materials showing each and every specific refurbished cell phone that was used to fulfill claims for T-Mobile, MetroPCS, and Cricket programs, for which the deductibles varied from $50.

35.     According to these records, Defendants provided approximately 748,748 total replacement phones to T-Mobile customers that fell within the National Class.  Of these National Class members, the Defendants discovered that 127 phones (.002% of the total shipments) were provided to customers where the applicable deductible was $40 and the equipment cost of the phone was less than $40.  They also provided 129 phones (another .002% of the total shipments) where the applicable deductible was $110 and the equipment cost of the phone was under $110.

36.     Also according to the records, Defendants provided 302,718 total replacement phones to customers of MetroPCS and 117,993 replacement phones to customers of Cricket that also fell within the National Class.  Among these National Class members, Defendants discovered that 214 phones (.07% of the total shipments) were provided to MetroPCS customers where the deductible was $85, and the equipment cost was less than $85, and 28 phones (.02% of the total shipments) to Cricket customers where the deductible was similarly $85 and the equipment cost was under $85.

37.     In sum, the Defendants identified approximately 498 additional members of the National Class who would qualify for the approved Subclass relief (currently 15,000 members) and would therefore also be entitled to receive vouchers for an additional phone.  On January 31, 2007, as part of this confirming discovery, Plaintiffs took the sworn deposition of James Flautt, Asurion's

13

corporate representative, on the specific issue of these additional 498 claims.  Mr. Flautt confirmed the

veracity of the information Defendants provided and stated that an exhaustive investigation had been

undertaken, there were no other phones that fell within the approved Subclass criteria, and specifically,

there were no replacement phones where the applicable deductible was $70 and the cost of the

replacement phone was less than the $70.

38.     As a result of these additional 498 claims, the parties negotiated an enhancement to the

approved Settlement (the "Enhancement").  Much discovery in this case revealed that the majority of the

replacement phones that the Subclass members received were only marginally lower than the deductible

rates (i.e. $44 to $49, and therefore only $5 less than the paid deductible).  Although the value difference

was relatively small, each Subclass member would still receive a voucher for an additional phone with a

value of at least $75 but not more than $100 (more than 25 times the customer's actual loss or injury).

Following this reasoning and logic, the parties agreed upon the Enhancement – namely that Subclass

members with deductibles of $85 and $110 (where the replacement phone had a slightly lesser value)

would receive the same voucher terms (full transferability and 90-day expiration) but with an increased

value of at least $125 but not more than $150.  They agreed that all of the Subclass vouchers would be

mailed directly to the Subclass members with no claim process required.

39.     On January 31, 2007, the Court set a status conference for February 14, 2007, to discuss

any proposed enhancements to the approved Settlement.  On February 9, 2007, the parties filed their

"Joint Motion to Revise the Approved Class Notice" (the "Joint Motion to Revise"), in order to propose

the Enhancement to the Court.  (DE-63, in Case No. 06-20734.)

40.     Prior to the status conference, Class Counsel discussed the proposed Enhancement with

counsel in the *Cole* case.  On February 13, 2007, the Court received a phone call from counsel for

Plaintiff Cole, requesting permission to appear at the status conference.  Cole's counsel, Mr. Taras Kick,

Esq., was not admitted *pro hac vice* to appear in this District.  As a courtesy, the Court permitted Mr.

14

Kick to attend the February 14, 2007 proceedings via video conference, and entered an Order requiring the parties to address whether Mr. Kick should also be permitted to actively participate in the proceedings.

41.     Both Class Counsel and Defendants filed objections to Mr. Kick's active participation. Among their objections was the fact that Ms. Cole had admitted that she is not a member of the National Class or Subclass in *Perez*, and thus, did not have standing to object to the proposed Settlement.  Further, Ms. Cole's individual claims, as well as the claims of all those who similarly did not receive refurbished phones from Defendants, would still proceed in the *Cole* action if the Court were to grant final approval of this Settlement.

42.     The Court conducted the hearing on February 14, 2007 to consider the Enhancement (the "Third Hearing").  While Mr. Kick was able to observe the proceedings, the Court did not allow his active participation.

43.     At the Third Hearing, the Court considered the Joint Motion to Revise, arguments of counsel, and all of the evidence in the record.  The Court granted the parties' motion, but made a few revisions to the Notice and Settlement Agreement.  The Court also raised an issue with appointed Lead Class Counsel regarding the designation of Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP (the "Lerach Firm") as additional Class Counsel, in light of some recent public events regarding that firm.  As a result, the Lerach Firm agreed not to serve as one of the appointed "Class Counsel" in this litigation.

44.     After the Third Hearing, Mr. Kick filed an emergency Motion/Application to Permit Winessa Cole to Intervene [DE-74, in Case No. 06-20734], pursuant to Federal Rule of Civil Procedure 24(b).  The Court considered the parties' papers and the relevant portions of the record, and exercised its discretion not to allow Ms. Cole's intervention [DE-86, in Case No. 06-20734].

45.     <u>Preliminary Approval.</u>  On February 28, 2007, the Court issued its Omnibus Order Regarding Class Action Settlement ("Omnibus Order" [DE-89, in Case No. 06-20734]).  Among other

things, the Omnibus Order: (a) granted preliminary approval of the Settlement, as amended;

(b) appointed Class Counsel and the Claims Administrator; (c) authorized the distribution of notice to the

Class; (d) established specific requirements, procedures and deadlines for Class members to object or opt

out; (e) established a deadline for the parties to respond to objections and file an application for

fees/expenses, and (f) set the Final Fairness Hearing for June 22, 2007.[8]

46.     Further, the Court determined class certification to be appropriate under Federal Rules of

Civil Procedure 23(a) and 23(b)(3) for purposes of settlement only.  Based on the evidence in the record,

the Court found that: (a) the Class members are so numerous that joinder of all Class members in the

*Perez* Action is impracticable; (b) there are questions of law and fact common to the Class that

predominate over any individual questions; (c) the claims of all of the named Plaintiffs are typical of the

claims of the Class; (d) common questions of law and fact exist and predominate over questions affecting

only individual Class members;[9] (e) the named Plaintiffs and Class Counsel can fairly and adequately

represent and protect the interests of all the Class members; and (f) a class action is superior to other

available methods for the fair and efficient adjudication of the instant controversy.[10]

---

[8]     On February 28, 2007, the Court also formally consolidated the *Lissabet* case, 06-20733-CIV-SEITZ/MCALILEY, into the instant case and closed that case.  (DE-47, in Case No. 06-20733.)

[9]     These include whether Asurion "adjusted the loss" for Class member claims during the Class Period; whether Asurion's use of insurance terms such as "deductible" and "adjust the loss" is deceptive and misleading; whether Asurion was unjustly enriched or received payments and/or monies that it cannot retain, under principles of equity; and what is the amount and proper measure of damages the Class sustained because of Asurion's allegedly inequitable conduct.

[10]    Notably, as previously mentioned, after the Court issued the Omnibus Order, the Court denied the motion for class certification in the related case, *Sanchez v. The Signal*, No. 05-22259-CIV-SEITZ/MCALILEY [DE-154 and DE-163].  In denying class certification (and Plaintiff's request for reconsideration on the issue), the Court highlighted numerous defenses, also raised by the Defendants here, that presented significant hurdles to any potential recovery.  The Court noted that each class member's own claim would need to be analyzed to determine whether or not they remained in the wireless phone protection plan (as most of the objectors here) and whether or not he/she was satisfied with the plan.  (*See* DE-163, in Case No. 05-22259.)  Moreover, each customer would need to prove that he/she received a "lower priced and/or defective phone" to have standing in the case.  Accordingly, more than one million Signal customers will receive none of the relief provided to Asurion's and lock/line's 10 million customers under this Settlement.

II.     **SUMMARY OF THE PROPOSED SETTLEMENT**

47.     The National Class consists of subscribers who received a refurbished replacement phone during the Class Period, and the Subclass consists of those subscribers who received a refurbished replacement phone whose acquisition cost to Asurion was less than the applicable deductible.  There are approximately 10 million National Class members and approximately 15,000 Subclass members.  None of the Subclass members have filed objections to this proposed Settlement.

48.     <u>National Class Relief.</u>  The Settlement Agreement provides the following benefits to the National Class Members:

a.     <u>Improved Disclosures.</u>  Asurion will ensure that, in the future, all placards and brochures distributed after the Class Period and describing the terms of the Programs (whether provided in stores and/or in brochures and/or advertisements) will include language substantially similar to the following:  "Claims may be fulfilled with *new and/or refurbished* equipment;" and "Each replacement phone is subject to a *non-refundable* [$ amount] deductible [or fee] per loss."

b.     <u>Improved Claims Administration Procedures.</u>  Asurion will ensure that, whenever a customer submits a claim, he or she will not receive a replacement phone for which Asurion's cost in providing the replacement phone is less than the amount of the applicable deductible or fee – unless Asurion specifically so advises the customer prior to collecting the deductible or fee during the claims process and the customer agrees to accept such phone.

c.     <u>Monetary Relief.</u>  Defendants agreed to provide each National Class Member with a Settlement Phone Card with a face value of at least $5 and to distribute a minimum of $1.5 million of those cards.  Based on Rust Consulting's most recent report, approximately 120,000 National Class members have submitted claims.  Accordingly, it appears that Settlement Participants will receive phone cards with a face value of approximately $10 to $12 – with a 10 cent per-minute charge to use the cards.  The Settlement Phone Cards are fully transferable and will expire 360 days after the date they are issued.

17

Defendants will bear the cost of the Settlement Phone Cards and the costs associated with their distribution.

        d.     <u>Additional Subclass Relief:  Vouchers.</u>  Each Subclass member will be entitled to all of the relief offered to National Class members.  In addition, Defendants will provide each Subclass member with a voucher entitling him/her to obtain another new or refurbished phone (valued at between $75 and $150) directly from Asurion.  The Subclass member does not have to return the replacement phone he/she had already received after paying the applicable deductible.  Each voucher will be valid for ninety (90) days after the date it is issued and will be fully transferable.  Defendants, through Rust Consulting, will mail these vouchers (via first-class United States mail) to each Subclass member's last known address, without the need for any action by the Subclass member.

        e.     <u>Cost of Claims Administration and Notice.</u>  Defendants have paid, and will continue to pay, all of the costs associated with the claims process, as well as the mailing and publication of notice to the 10.3 million Class members.  Defendants estimate these costs to be approximately $3.5 million.  Defendants have agreed to continue paying for all costs associated with issuing the vouchers and phone cards to all Class members.  The Court finds this to be a valuable benefit to the Class.

## III.   <u>EFFECTIVE AND APPROPRIATE NOTICE</u>

        49.    <u>An Overview of the Notice Program.</u>  In conjunction with Rust Consulting, the parties developed a comprehensive notice program.  The proposed notice program consisted of four major components:  (1) a Postcard Notice mailed to the last known address of each Class member; (2) a Summary Notice published in *USA Weekend*; (3) a toll-free Settlement Hotline; and (4) a Settlement Website.  Essentially, the Postcard Notice and the Summary Notice contained the vital information regarding the litigation and the Class members' rights – including the right to opt out of and object to the Settlement and the right to submit a claim.  The Settlement Hotline and the Settlement Website contained more detailed information.  The Postcard Notice and the Summary Notice each directed Class members

to visit the Settlement Website and/or call the Settlement Hotline for more information.

50.     The proposed notice program enabled National Class members to complete a short, simple claim form online (available on the Settlement Website).  National Class members could also complete a "hard copy" of the same claim form, which could be requested using an automated voicemail feature of the Settlement Hotline or a "link" on the Settlement Website.

51.     The Court closely scrutinized the form and the content of the proposed notice program. Before approving the notice program, the Court directed the parties to, among other things, (1) change or add language to the Postcard Notice and the Summary Notice; (2) file an affidavit justifying Rust Consulting's choice of *USA Weekend* as the periodical in which to publish the Summary Notice; and (3) simplify the claim forms.

52.     <u>The Court's Approval and Further Requirements.</u>  In its Omnibus Order, the Court approved the notice program, as revised by the Court.  The Court ordered the parties and the Claims Administrator to:  (1) mail the Postcard Notice to each of the National Class Members at their last known address by or before April 27, 2007; (2) submit a declaration, by May 18, 2007, attesting that the Postcard Notices were timely mailed; and (3) publish the Summary Notice by or before April 27, 2007. The Court also instructed the parties to publicize the Settlement using all possible means, including press coverage.

53.     <u>The Postcard Notices.</u>  Using data Defendants provided, Rust Consulting generated 10,347,446 unique records, each representing the name and address of a National Class member.  Rust Consulting processed each of the 10,347,466 addresses through the Coding Accuracy Support System ("CASS") certified software to obtain the nine-digit zip codes and the all-uppercase format that the United States Postal Service preferred.  Rust Consulting also utilized the Locatable Address Conversion System ("LACS") service, which provides an automated method of obtaining new addresses.  After determining that it had the last known address for each of the National Class members, Rust Consulting

generated 10,347,466 Postcard Notices.  By April 27, 2007, Rust Consulting had mailed all of the 10,347,466 Postcard Notices to the National Class.[11]

54.  <u>The Rust Declaration.</u>  Pursuant to paragraph 66 of the Omnibus Order, on May 18, 2007, the parties filed the Declaration of Joel Botzet (the "Botzet Declaration" [DE-105]).  The Botzet Declaration attested that Rust Consulting had mailed the Postcard Notices in accordance with the Court's Omnibus Order.  The Botzet Declaration also explained Rust Consulting's process for determining each National Class member's last known address.

55.  <u>The Summary Notice.</u>  Also, pursuant to paragraph 66 of the Omnibus Order, Rust Consulting published the Summary Notice in the April 20-22, 2007 edition of *USA Weekend*.[12]

56.  <u>The Spanish-language Hotline.</u>  On April 23, 2007, Rust Consulting added a Spanish-language option to the Settlement Hotline.

57.  <u>Publicity of the Settlement.</u>  In accordance with the Court's directive, in the days after the January 23, 2007 hearing, Class Counsel drafted and circulated a press release and provided information regarding the proposed settlement in numerous national and state publications, trade and industry magazines, as well as numerous consumer-related web sites.  Class counsel filed copies of these sources with the Court [DE-94].  Moreover, the parties posted a copy of their motions for final approval

---

[11]  Prior to mailing the Class Notice, the Claims Administrator entered the Class members' names and addresses into the United States Postal Service's National Change of Address ("NCOA") processing center for up-to-date addresses and CASS certification.  The NCOA processing center contains a consolidated file of move information that, on average, contains approximately 108 million permanent change-of-address ("COA") records filed with the United States Postal Service.  Each record contains the relocating postal customer's name, along with an old and new address.  The old address is the one compared to the NCOA customer list for matching purposes, and the new address is the one returned, if a match is made, to the customer.  Since approximately 18-20 percent of the households and businesses in the United States move each year, the NCOA service is increasingly valuable in reducing undeliverables and helping increase response rates.  The Claims Administrator is further keeping track of any returned or undeliverable Postcard Notices.

[12]  The Claims Administrator caused the Summary Notice to be published once in the national weekend edition of *USA Today*.  The weekend edition of *USA Today* has a circulation of approximately 23.4 million readers.  The Summary Notice was also published on the Settlement Website.  The Summary Notice highlights the terms of the proposed Settlement and provides instructions for obtaining the complete Settlement Agreement and/or Proof of Claim Form and how to file a Request for Exclusion from the Class or object to the Settlement.

of the Settlement on the Settlement Website so that all Class members could read and understand the reasons for the specific Settlement terms.

58.     <u>Best Practicable Notice.</u>  The parties provided extensive notice to the Class through a variety of media.  The Postcard Notice was mailed via first-class United States mail, postage prepaid, to the most recent address of all National Class members.  As previously discussed, the Postcard Notice summarized the litigation and directed Class members to the Settlement Website, where Class members could obtain detailed information about the Settlement and print the complete Settlement Agreement and/or Proof of Claim form.  At the Court's suggestion, the Settlement Website also provided a complete and detailed history of the litigation and a Frequently Asked Questions and Answers section.  Class members are able to submit a claim electronically by entering a personal identification number ("PIN") contained on the Postcard Notice, as more fully described below.

59.     The Postcard Notice also directed Class members to a toll-free telephone number that they could call to obtain information about the Settlement and to request a copy of the complete Settlement Agreement and/or Proof of Claim form via U.S. Mail.  The Claims Administrator operates the toll-free number, which provides an automated recording instructing each Class member to leave a message indicating his/her address and the documents being requested.

60.     The Claims Administrator also maintains the Settlement Website.  The Settlement Website contains, among other things, the Summary Notice, the Settlement Agreement, the Proof of Claim form and a Question and Answer form.  Class members can get information about the Settlement and print the complete Settlement Agreement and/or Proof of Claim form by accessing the Settlement Website.  Class members also can submit their Proof of Claim forms electronically by entering the requested information on the Settlement Website.

61.     <u>Approval of Class Notice and Assertion of Personal Jurisdiction Over Class.</u>  For a court to exercise jurisdiction over the claims of absent Class members, there must be minimal procedural due

21

process protection.  Absent class members must receive notice and an opportunity to be heard and to participate in the litigation, whether in person or through counsel.  Fed. R. Civ. P. 23(c)(2)(B).  The notice must be the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  Here, among other things, the Postcard Notice defined the settlement Class; described the allegations of the Complaint; informed Class members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Fairness Hearing; informed Class members of their right to enter an appearance through counsel, if they desired; notified Class members that a Class judgment would bind them unless they opted out; and told them where they could obtain more information, such as a full copy of the Settlement Agreement.  The Summary Notice contained a shortened version of the same information and explained how to get more detailed information.  Accordingly, the Court finds that the notice provided to the Class members was sufficient to satisfy the requirements of due process, and accordingly, that this Court has personal jurisdiction over the entire Class because the Class was provided with the "best practicable notice."

**IV.     THE CLASS MEMBERS' RESPONSE TO THE PROPOSED SETTLEMENT**

62.     The Class's Use of the Notice Program's Interactive Features.  Rust Consulting has carefully monitored the Class's response to the notice program and has maintained detailed records reflecting the response.  The statistics cited below are current as of June 24, 2007.

63.     Postcard Notices Returned.  Of the 10,347,466 Postcard Notices mailed, 1,022,821 – or less than 10% – were returned as undeliverable.  According to Rust Consulting, this rate of returned mailings is typical.  (*See* June 21, 2007 Botzet Decl. [DE-146].)

64.     Claims Filed.   Of the approximately 10.3 million National Class members, 118,663 people have filed claims.  Of these, 108,134 people completed claim forms on line; the remaining 10,529

people submitted "hard copies" of the claim form.  The claims period closes on July 26, 2007.

65. <u>Exclusions.</u>  Of the approximately 10.3 million National Class members, 1,311 people requested exclusion from the Class.  Of these, 27 exclusion requests were submitted after the May 21, 2007 deadline.  The parties have agreed to honor the untimely exclusion requests.  The parties have also agreed to send to each of these 1,311 National Class members (to the best of their ability in identifying an address for each member) a letter indicating that they are being officially recognized as having opted out of the Settlement, that they will not be receiving a phone card and/or voucher, and that their individual rights have been preserved.

66. <u>The Settlement Website.</u>  Since the Settlement Website was launched on March 26, 2007, it has had 182,489 unique visitors.  In other words, 182,489 different computers have accessed the Settlement Website.  The  Settlement Website has been visited 225,644 times; in other words, some of the unique visitors returned to the website on one or more occasion.  Finally, there have been 3,209,998 "hits" or "clicks" on the Settlement Website.  This statistic indicates that visitors to the Settlement Website were accessing the various interactive features.  On average, visitors made 14 hits per visit.

67. <u>The Settlement Hotline.</u>  There have been a total of 130,715 callers to the Settlement Hotline.  Of these, 1,192 utilized the Spanish language option.  Copies of the English and Spanish scripts of the automated messages were filed with the Court [DE-151].

68. Defendants informed the Court that, as of the date of the Final Fairness Hearing, they had spent:  (1) $2.3 million on mailing the 10.3 million Postcard Notices; (2) $290,451 for publication of the Summary Notice; and (3) $2,650 per month since March 2007 to maintain the Settlement Website.

69. <u>Objections.</u>  Class members were advised that, in order for the Court to consider their objections to the proposed Settlement, they must file any objections with the Court by May 21, 2007.  Only nine class members properly filed objections to the Settlement.  (*See* DE-95, DE-96, DE-97, DE-102, DE-108, DE-110, DE-112.)  In any event, the parties agreed to treat as an official objection any

letter containing any type of "objection" language and written directly to the Court, Rust Consulting, and/or any of the parties.  In total, there were approximately 102 "objections" to the Settlement.

70.     Three attorneys – Paul D. Kamenar, Esq., on behalf of Objector Glenn Lammi; Kenneth E. Nelson, Esq., on behalf of Objector Dina Hill; and Edward F. Siegel, Esq., on behalf of Objectors Chad Simmerson, Barbara Rose, and Rita Carfagna (collectively, "Objectors' Counsel") – filed motions indicating that they intended to appear at the Final Fairness Hearing.

71.     By Order dated June 19, 2007, the Court established an agenda for the Final Fairness Hearing.  The Court set aside time for each of the Objectors' Counsel to present his objections.

## V.     THE FINAL FAIRNESS HEARING

72.     The Final Fairness Hearing was held on June 22, 2007.  Edward Siegel, Esq. appeared in person on behalf of Objectors Chad Simmerson, Barbara Rose, and Rita Carfagna.  Neither Mr. Nelson nor Mr. Kamenar attended the hearing.[13]  The Court allowed Mr. Siegel over one hour to discuss his client's objections to the Settlement.  The hearing lasted a full day, and the Court heard from all parties regarding every facet of the proposed Settlement.

73.     The Court did not find any of the papers filed by Objectors' Counsel to be particularly helpful or to have conferred a benefit on the Class, as they were generic compilations of well-known case law and lacked specific application to this case.  In short, they appeared to be standard form arguments filed in other cases.  However, the Court did find that Mr. Siegel's attendance at the Final Fairness Hearing provided a safety check for the parties and the Court.  Accordingly, upon submission of the appropriate, supporting documentation, Mr. Siegel may seek an award to reimburse his actual travel expenses to the hearing and a reasonable hourly rate for his actual time in attendance at the hearing.  Such award will be made from the attorneys' fees fund.

---

[13]     At the hearing, Mr. Siegel advised the Court that Mr. Nelson had given him permission to represent Objector Hill's interests.

74.     At the conclusion of the Final Fairness Hearing, the Court verbally granted final approval of the Settlement, finding that it was fair, reasonable and adequate.  The Court also preliminarily approved the  the requested attorneys' fees and costs.  Finally, the Court directed the Plaintiffs to file a supplemental brief that addressed the level of involvement of each named Plaintiff, so that the Court could consider whether to award him or her an incentive fee, and if so, how much.  Class Counsel filed the requested supplement on June 26, 2007 [DE-150].

## VI.     FAIR, REASONABLE, AND ADEQUATE SETTLEMENT

75.     The law has long been settled in this Circuit that, "[i]n determining whether to approve a proposed [class action] settlement, the cardinal rule is that the district court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977).[14]  "Determining the fairness of the settlement is left to the sound discretion of the trial court . . . ." *Bennett v. Behring Corp.*, 737 F. 2d 982, 986 (11th Cir. 1984). The Court's exercise of discretion in this regard should be "informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.*  As then Chief Judge King aptly stated in *Behrens v. Wometco Enters., Inc.*, 118 F.R.D 534, 538 (S.D Fla. 1988) (internal citations omitted):

> Litigants should be encouraged to determine their respective rights between themselves.  This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length.  Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness.

The Eleventh Circuit has also identified six factors that a district court should examine when assessing whether a proposed settlement is "fair, adequate and reasonable."  These factors include:

---

[14]     In *Bonner v. City of Prichard*, 661 So. 2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. "In evaluating these considerations, the district court should not try the case on the merits." *Behrens*, 118 F.R.D. at 539 (*citing Cotton*, 559 F.2d at 1330). Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Assoc. for Disabled Ams. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) (*quoting Cotton*, 557 F. 2d at 1330).

After carefully reviewing the pertinent factors, the Court concludes that the proposed Settlement negotiated by the parties in the instant case is fair, adequate and reasonable under all of the circumstances and was reached after both parties conducted significant investigation and voluntary discovery. Further, the Court reiterates its previous finding in its Omnibus Order that the Settlement reflects an arms-length compromise, and was not the product of fraud or collusion by the parties or their attorneys.

76.   The *Bennett* Factors.

a.   Likelihood of Success at Trial.   Where a substantial question exists regarding the likelihood of success at trial, this factor weighs in favor of approving a proposed class action settlement. *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1330-31 (S.D. Fla. 2001). This case faced significant hurdles for Plaintiffs, especially in their quest to prove the merits of each claim and to show that any of the Class members suffered an actual injury. The essence of Plaintiffs' claims is that Defendants' customers paid premiums and deductibles to "insure" their cell phones, only to receive replacement phones valued much less than such payments. However, extensive discovery revealed that, for almost every Class member, this was not so. During discovery, Defendants produced documents confirming that only a very small percentage of the Class (approximately 15,000 of 10.3 million customers) received a

26

replacement phone that, under Plaintiffs' calculation, could be valued at less than the premium and deductible payments.  Based on this information, Plaintiffs would have incurred substantial costs and risks in a most likely unsuccessful attempt to win on the merits at trial.  In addition, in the unlikely event of success at trial, there would most likely have been appellate proceedings, further delaying Class recovery.

Moreover, as the Court reiterated in denying the plaintiffs' class certification motion in *Sanchez v. The Signal*, Case No. 05-22259-CIV-SEITZ/MCALILEY, each individual Class member's own facts would have had to be analyzed to determine why each customer remained in the phone protection program after learning of the refurbished nature of the phone (as with most of the objectors).  Even though the Plaintiffs believed, based on reasoned investigation, that they had meritorious claims, the strong defenses that Defendants could have asserted weighed in favor of settlement.

b.    <u>Range of Possible Recovery and the Point at which a Settlement is Fair.</u>  "The second and third considerations of the *Bennett* test are easily combined." *Behrens*, 118 F.R.D. at 541.  A district court must first determine the appropriate standard of damages (in order to calculate the range of recovery), and then determine where in this range of recovery a fair, adequate and reasonable settlement amount lies.  *Id*.  The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable.  *See Behrens*, 118 F.R.D. at 542 (explaining that "a settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery").

In this case, the range of recovery is very narrow relative to the benefits of the proposed Settlement.  Defendants have agreed to provide a minimum of $1.5 million in Settlement Phone Cards, to send out vouchers for replacement phones with an approximate aggregate additional value of $1.5 million, and to pay all costs associated with this Settlement which will total almost $3.5 million.  More importantly, Defendants have agreed that they will not send to a customer a phone valued less than the

charged deductible without first advising that customer.  They also have agreed to change all of their placards and promotional brochures describing the specific terms of the phone protection programs. These benefits to Defendants' approximately 40 million customers – when viewed against the backdrop of all of the uncertainties, risks, and problems that have surfaced in this litigation (including the limited damages suffered by only 15,000 Subclass members) and the reasonable possibility that Plaintiffs would not have recovered <u>anything</u> if they had proceeded to trial – weigh heavily in favor of approving this Settlement.

       c.    <u>Complexity, Expense and Duration of Litigation.</u>  "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigation."  *Id.* at 543.  Moreover, what the Eleventh Circuit stated regarding settlements nearly three decades ago applies with even more force here:  "In these days of increasing congestion within the Federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources."  *Cotton*, 559 F. 2d at 1331.

       If this case were tried, the Plaintiffs would incur significant trial expenses.  Experts in cell phones, insurance policies, and damages calculations might all have been necessary to address these specific issues.  As previously mentioned, the case would not conclude at trial, but would continue with appellate proceedings.  With the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear.  Moreover, one of the main goals in bringing all of these cases in the first place – namely better disclosure for all customers so that they can make an informed choice in the purchase of Defendants' wireless phone protection plan – is being specifically accomplished with this proposed Settlement. Absent a settlement, Defendants would have defended these three lawsuits vigorously, with potential success and no recovery of any kind for Plaintiffs.

       d.    <u>Substance and Amount of Opposition to the Settlement.</u>  This Settlement should

also be approved because the Class has overwhelmingly accepted it.   "In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor.   *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).   A low percentage of objections demonstrates the reasonableness of a settlement.   *Id.*   Conversely, a high percentage of objections indicates that a class action settlement may very well <u>not</u> be fair and reasonable.   *Id.*   In *Lipuma*, of the nearly 9,000,000 notices mailed to the class, there were 1,159 opt-outs and just 41 objections.   *Id.*   The *Lipuma* court found that 41 objections constituted an "infinitesimal" number (0.0005%) when compared to the number of class members.   *Id.*

Here, the Court-approved notice program set out a very specific procedure for Class members to officially file an objection to the proposed Settlement.   Approximately 9 people exactly complied with this procedure.   Other Class members simply wrote letters to Class Counsel, Rust Consulting, or the Court, some of which included "objection"-type comments while others favored the Settlement.   Class Counsel took each letter very seriously and undertook the unusual task of attempting to contact each and every one of these Class members.   Class Counsel called every such Class member (over 300 people) and sent letters to each one, denoting in the letter a specific lawyer whom they could contact directly for additional information.   (*See* Schwager Aff. [DE-119].)   The June 5, 2007 Schwager Affidavit details each and every contact made with these Class members.

The number and corresponding percentage of objections to the proposed Settlement is approximately 100 out of 10.3 million, or 0.001% (if every letter or phone call is considered an official "objection").   This is a minuscule figure, and is certainly insignificant when compared to the millions of Class members.   Accordingly, given the large number of claims filed in this case (approximately 120,000 National Class members have filed claims as of June 24, 2007), the small number of objections weighs in favor of approval.   *See Lipuma*, 406 F. Supp. 2d at 1324.

The lack of substance of the objections also weighs in favor of approving the Settlement.

29

The Court has considered the arguments raised by the proportionately small number of objectors, and finds that the objections do not identify problems sufficient to justify rejecting the proposed Settlement. Upon due consideration, it appears that most of the objectors have simply misread and/or misunderstood the Settlement documents and/or desired to "have a better deal." The majority of the objectors focused only on the monetary portion of the Settlement for the National Class (namely, the phone cards). They argued that the phone cards should provide "more" value than just $5, and that they should have a "lower" charge per minute than the current per minute charge of 10 cents. No objector raised any concerns with the full transferability of the cards or with the extended expiration date of the cards (360 days). None of these objections discussed the significant injunctive relief that will benefit the over 70 million consumers that lose and/or damage their cell phones each year.

The Court will overrule the objections as to the phone cards and vouchers. The Court has already ruled that, to have standing in this case, a customer needed to have received a replacement phone valued lower than the deductible paid. The only members of the Class that received such lower-valued phones (under any calculation) are members of the 15,000-person Subclass who are receiving vouchers for replacement phones valued between $75 and $150 (which is approximately 25 times the value of each customer's loss, and thus a significant benefit). It does not appear that any of the Subclass members have objected to this relief.[15]

Also, Class Counsel was able to negotiate several important provisions with respect to the phone cards and vouchers, all of which provide significant value to the Class. For the phone cards these included: full transferability, 360-day expiration, and a $1.5 million minimum distribution. For the

---

[15] In fact, as previously mentioned, by currently remaining in the wireless phone protection programs, many of the objectors likely would not have been entitled to any damages had the case gone to trial, but are receiving a benefit by way of this Settlement. (*See* Apr. 3, 2007 Order Denying Pl.'s Suppl. Mot. for Class Cert. at 7 [DE-154, in Case No. 05-22259]) ("[I]f customers are told in some manner other than through the printed brochures that The Signal sends out refurbished replacement phones . . . and those customers still elect to keep the insurance and make claims for replacement phones, they are not getting anything but exactly what they bargained for").

vouchers these included:  full transferability, 90-day expiration, no claims process, and no requirement to return the previously provided replacement phone.

Another problem with many of the objections is their inaccurate characterization of the phone cards as "coupons."  The phone cards are not mere coupons, but rather full-value, fully transferable, long-distance telephone cards – not unlike those available from any number of retail outlets.  Because long-distance telephone carriers are honoring these phone cards, and not Asurion, there is no required future purchase from, or any other type of future dealing with, Asurion as the "issuer" of the phone cards.

Further, those objectors that object to the phone cards also ignore the negotiated $1.5 million minimum redemption floor (and lack of ceiling), and the pro-rata distribution method for the phone cards in the event of a low claims rate.  The minimum redemption requirement ensures that Defendants must disgorge $1.5 million to the Class regardless of the claims rate.  Thus, there is no need to wait for the final claims data to evaluate the success of the National Class's monetary recovery before valuing this portion of the settlement.  The pro-rata distribution method is an additional benefit, since in the event of a low response rate, those consumers who do file claims can receive phone cards valued at more than the $5 minimum value.

Lastly, some objectors have speculated that long-distance phone cards are of no value to cell phone customers, as such customers get long-distance services as part of their cell phone plans.  However, the vast majority of cell phone customers also have a regular telephone (or access to one), for which long-distance phone cards have value.  Also, because the phone cards are fully transferable, the rare cell phone customer who does not have access to a regular telephone (and no intention to use a pay telephone) can transfer the card to someone else for like consideration.

e.      The Stage of the Proceedings.  The stage of the proceedings at which the parties agreed to settle this matter without further litigation likewise reflects the fairness of this Settlement.  A

court evaluates the stage of the proceedings at the time of settlement to ensure that the plaintiffs have access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation.  *See Behrens*, 118 F.R.D. at 544.

Here, as already described, the Settlement was achieved early in the litigation, but not so early that Class Counsel did not have sufficient information with which to negotiate.  Defendants produced hundreds of thousands of documents to Plaintiffs and made available all of the necessary witnesses for depositions.  Thus, the litigation risks and expenses facing the parties, had they not reached a settlement, were substantial, and the possibility that the Plaintiffs could have recovered nothing after a long legal battle was real.

Class Counsel advised the Court that they conducted an extensive, pre-suit investigation and evaluation of the facts and law relating to Plaintiffs' claims in order to determine how best to serve the Class's interests.  This investigation included a study of publicly available information as well as review of experts' analysis, interviews of Class members, and a review of pertinent documents.  It is clear to the Court that the parties were "well aware of the other side's position and the merits thereof" when settlement negotiations commenced.  *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d at 1332.  The parties and their counsel should be commended for their successful efforts to reduce the polarization that is all-too-familiar in the class action arena while fostering a spirit of courtesy and professionalism.

77.    The Judgment of Experienced Counsel and the Absence of Collusion.  A district court properly considers the judgment of experienced counsel when asked to approve a class action settlement.  *Behrens*, 118 F.R.D. at 539.  Here, Class Counsel and counsel for Defendants are all experienced lawyers highly skilled in class action work.  The judgment of these attorneys that the proposed settlement is "fair, adequate and reasonable" also supports approval of the parties' proposed Settlement.

Further, the Court has already found, after carefully reviewing the background of the parties' negotiations, that this Settlement is the result of arms-length negotiation.  In preliminarily approving the

Settlement, the Court noted that "settlement negotiations did not begin until after Class Counsel had substantively litigated the three cases, taken several key depositions, and reviewed thousands of documents." (Feb. 28, 2007 Omnibus Order Regarding Class Action Settlement [DE-89].)  Moreover, Brian Spector, Esq., an experienced and well-respected mediator in this District, oversaw most of the settlement process.  Class and Defense Counsel have ably and professionally represented their respective clients free from any conflicts of interest.  The proposed Settlement is not the product of fraud or collusion.

VII.   <u>CONCLUSION</u>

Based on the foregoing, it is hereby

ORDERED that:

(1) Class Counsel's Motion in Support of Request for Final Approval of the Settlement [DE-132] is GRANTED.  The parties' proposed Settlement is fair, adequate and reasonable, and not the product of collusion between the parties or their attorneys.  Thus, the proposed Settlement is GRANTED FINAL APPROVAL;

(a) The Court anticipates that Defendants shall be able to cause to be issued all phone cards and vouchers, as appropriate, within 60 days of this Order.  By **August 1, 2007**, Defendants shall submit a proposed schedule for distribution within the next 60 days, to be approved by the Court.  If 60 days is insufficient, Defendants shall so advise the Court in their August 1st filing, give the reasons therefor, and propose an alternative plan for distribution, to be approved by the Court;

(b) The parties shall file with the Court, by the 25th day of each month, monthly progress reports as to the status of the Settlement "payout" and any issues therewith, until the National Class and Subclass members have received all of the benefits to which they are entitled;[16]

---

[16]     If the 25th day of the month falls on a Saturday, Sunday, or legal holiday, then the parties shall file the progress report on the next business day thereafter.

(2) All objections to the Settlement are OVERRULED;

(3) All pending motions not otherwise ruled upon in this Order, <u>with the exception</u> of DE-131

(Class Counsel's Motion in Support of Request for Attorneys' Fees and Costs) and DE-166 (Objector

Dina Hill's Second Motion for Reconsideration Regarding Order on Motion for Attorneys' Fees and

Incentive Costs),[17] are DENIED AS MOOT;

(4) The pretrial conference scheduled for August 16, 2007 is CANCELED; and

(5) This case is CLOSED.


DONE and ORDERED IN Miami, Florida this 26th day of July, 2007.

_____

PATRICIA A. SEITZ

UNITED STATES DISTRICT JUDGE


cc:     All Counsel of Record

---

[17]     Separate Orders shall issue.

34